Danny Huff
1554 Liberty Circle
Shakopee, MN 55379
Ph: 612-801-6678
Email: mn21delaer@gmail.com
8/1/2022

RECEIVED

AUG 01 2022

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| DANNY HUFF,<br><br>        Plaintiff,<br><br>    v.<br><br>CANTERBURY PARK<br><br>HOLDING CORPORATION<br><br>        Defedant. | Case No. ___22-cv-1922 WMW/ECW___<br><br>**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES FOR: VIOLATIONS OF THE FAIR LABOR STANDARDS ACT (FLSA); MINNESOTA FAIR LABOR STANDARDS ACT (MNFLSA); MINNESOTA LABOR STATUTES, RETALIATION IN VIOLATION OF THE FLSA; VIOLATIONS OF PUBLIC POLICY**<br><br>**DEMAND FOR JURY TRIAL** |

0

# INTRODUCTION

1. This is an action for relief from Defendants' violations of Plaintiff's workplace rights. Defendant blatantly violated both federal and state wage and hour laws,and then unlawfully retaliated against Plaintiff Danny Huff ("Plaintiff") for asserting his protected rights under these laws.

2. Plaintiff worked for Defendant for nearly ten years in various positions until his employment was terminated by the Defendant. For the final few years of employment, Plaintiff was employed as an Assistant Pit Manager. Plaintiff was a hard-working, reliable employee who dependably ensured the the operations of the Defendants ran efficiently. During his employment, Plaintiff routinely worked "off-the-clock" on various projects to enhance the business operations of the Defendant. Management employees of the Defendant had actual and constructive knowledge of the Plaintiff's work, yet failed to compensate him for it.

3. After the Plaintiffs termination of employment, management made efforts to rehire the Plaintiff. However, shortly after Defendant received a demand letter to redress the unpaid wages, Defendant stopped those efforts to rehire Plaintiff and excluded the Plaintiff from Defendants property. Defendants unlawfully retaliated against Plaintiff for asserting his legally protected activities, in violation of the FLSA.

# JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and Section 16(b) of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, et seq.

5. This Court has supplemental jurisdiction over the related state statutes pursuant to 28 U.S.C. § 1367(a) because Plaintiff's claims under the Minnesota Fair Labor Standards

1

Act, Minnesota Employment Statutes, and Minnesota common law for part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with his federal law claims, and the Defendant is identical. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

6. Venue is proper in the District of Minnesota because Plaintiff resides in this District, Defendant is located and employed Plaintiff in this District, and the unlawful employment practices alleged herein giving rise to Plaintiff's claims occurred in this District.

## NATURE OF THIS ACTION

7. This is an action brought pursuant to the FLSA, MNFLSA, Minnesota Employment Statutes, and state common law to obtain relief for Plaintiff.

8. This action is brought by Plaintiff to secure declaratory relief and damages to remedy Defendants' violations of federal, state, and local employment laws by failing to adequately compensate Plaintiff for the hours he worked, and to secure declaratory, compensatory, and punitive damages to remedy Defendants' commission of unlawful retaliation for Plaintiff's assertion of his protected rights under federal and state employment laws.

## PARTIES

9. Plaintiff DANNY HUFF is a current resident of Shakopee, Minnesota. He was employed by the Defendant from on or about March, 2012 to March 3, 2022 and was at all relevant times a non-exempt employee.

10.     Defendant CANTERBURY PARK HOLDING CORPORATION, is a company doing business in Minnesota. CANTERBURY PARK HOLDING CORPORATION is

primarily an entertainment venue which features horse racing, a card club, and special events with gross sales or buisiness done of $500,000 or more per year. At all times relevant herein Defendant CANTERBURY PARK HOLDING CORPORATION was Plaintiff's employer covered by the FLSA, MNFLSA and Minnesota Employment Statutes.

11.      At all times relevant herein, Defendant acted through its agents, servants and employees, all of whom acted in the course and scope of their employment.

## STATEMENT OF THE FACTS

12.      Plaintiff was employed by Defendant in Shakopee, Minnesota in many positions from approximately March, 2012 to March 3, 2022.

13.      For all years covered under the statute of limitations Plaintiff was employed by Defendant as an Assistant Pit Manager.

14.      Plaintiff had many direct supervisors and managers who were employed by the Defendant ("managers").

15.      Managers know or should have known FLSA laws.

16.      The FLSA defines "employ" to include the words "suffer or permit to work".

17.      During the Plaintiffs employment with Defendant, the Plaintiff was not aware of a written procedure to track hours worked at home.

18.      During the Plaintiffs employment with Defendant, the Plaintiff was not aware of a written procedure to report hours that were unpaid.

19.      During the Plaintiffs employment, Plaintiff was not paid all wages and overtime premium wages for the hours he worked for the Defendant.

20.     During the Statutory Period, Plaintiff worked up to or about 54 hours in a workweek and was not paid for all hours worked over 40 in a workweek as required under the FLSA.

21.     Plaintiff was employed as a non-exempt, hourly rate employee as defined by 29 U.S.C. section 203(e)(1).

22.     Coverage under the FLSA, MNFLSA, and Minnesota Employment Statutes includes both current and former employees.

23.     Plaintiff worked on many different projects to enhance the workflow of day to day operations of the Defendant.

24.     Plaintiff worked on projects for the benefit of the Defendant from 2015 up to the date of Plaintiff's termination of employment

25.     Plaintiff's first project for the Defendant was in 2015, creating a computerized attendance tracking system for the department he was employed in.

26.     Defendant was tracking attendance in a method that was very time consuming.

27.     Plaintiff showed management a possible way to speed up the attendance tracking process.

28.     Plaintiff received approval from his managers to work on the tracking system at home.

29.     Plaintiff spent hundreds of hours at home working to complete the project, unpaid.

30.     Plaintiff was allowed a small amount of time to work on the project while "punched in" at work when the project was nearly completed, in order to enter the old information into the new tracking system.

31.    Plaintiff was never asked how much time was being spent at home working on

the attendance project.

32.    Because Plaintiff was a loyal and dedicated employee who wanted the

Defendant to be successful, he did not question why he was not paid.

33.    Plaintiff was never paid for any of his time working at home on the attendance

tracking project.

34.    In 2015, Plaintiff received an "Employee of the Month" award from Jeff Davis, a

direct manager of his.

35.    Plaintiff was recognized for his work on the attendance tracking "on his own

time".

36.    After completing the attendance tracking project, it became common for Plaintiffs

managers to ask him to complete other projects for the benefit of the Defendant.

37.    Plaintiff also would also ask permission to work on projects that he would come

up with himself to benefit Defendant.

38.    Plaintiff kept his own weekly logs of the number of hours he spent each week

working at home, unpaid, for the benefit of the Defendant.

39.    At first, because Plaintiff did not have time during his shifts to work on any

projects, he did most of the work at home, unpaid, with the Defendants knowledge.

40.    For at least the last three years of Plaintiffs employment, Defendant scheduled

Plaintiff once a week, at Defendants place of emplpyment, time to work on the same

projects Plaintiff would work on at home that he was not properly paid for.

41.    Plaintiff was given access to Defendants email system and VPN network to

facilitate his work at home and unpaid.

42.      Plaintiffs managers had actual and constructive knowledge of all projects that were worked on at home and knew Plaintiff was not being paid for that work.

43.      Plaintiff made comments verbally and electronically to his managers on several occasions specifically mentioning that he was doing a lot of work "off-the-clock" and not being paid.

44.      Several of the comments were directed to Senior Pit Manager for the Defendant, Christopher Swanson.

45.      Mr. Swanson would reply that Plaintiff's work was appreciated yet willfully violated Plaintiffs rights to be paid for all regular and overtime hours worked by not correcting Defendants time records.

46.      Mr. Swanson is also the employee for the Defendant who approves the time cards for the department the Plaintiff worked in.

47.      Mr. Swanson engaged in thousands of text messages with Plaintiff during the Plaintiffs employment.

48.      Mr. Swanson had direct knowledge of Plaintiffs unpaid work at home and approved Plaintiffs time sheets anyways.

49.      Others that had requested projects from the Plaintiff were Vice President of Card Club Operations, Michael Hochman and Vice President of Human Resources, Mary Fleming.

50.      Both Mr. Hochman and Ms. Fleming had direct knowledge that Plaintiff worked at home on projects and was not being paid correctly.

51.      Eventually, Plaintiff was allowed one day a week at work to work on projects that he would normally have had to work on at home.

52.     Defendant gave Plaintiff tools to be able to work at home and accepted the benefits of projects the Plaintiff worked on, without compensating Plaintiff for the time.

53.     Plaintiff was expected to quickly fix issues that arose with his projects, at home, unpaid.

54.     On March 3, 2022, Defendant terminated Plaintiffs employment.

55.     Plaintiff was issued a 30 day exclusion from the Defendants property when his employment was terminated.

56.     Six days after Plaintiff's termination of employment, Vice President of Card Club Operations for the Defendant, Michael Hochman, engaged Plaintiff and notified him that he was trying to find a way to hire Plaintiff back with the Defendant.

57.     Communications with Mr. Hochman continued through March 13, 2022.

58.     The last communications between Plaintiff and Mr. Hochman had no indications that Mr. Hochman was no longer attempting to hire Plaintiff back.

59.     On or about March 16, 2022, Defendant received a demand for unpaid wages and overtime wages from Plaintiff.

60.     Using Plaintiffs own records, Plaintiff included with the demand, a list of workweeks with the number of hours Plaintiff was not paid for his work, broken down into regular and overtime hours, and the total amount of wages due to him. (Exhibit 1).

61.     Plaintiff should have also received PTO for any hours worked, unpaid.

62.     The list of workweeks did not include accrued PTO that Plaintiff was entitled to, per the Defendant's Employee Handbook.

63.     If Defendant would have paid all of Plaintiffs work hours properly, between April 7, 2019 and March 3, 2019, Plaintiff would have accrued 75.00 hours, or $2,363.40 worth of PTO.

64.     As shown in this list of workweeks, between April 7, 2019 and March 3, 2022, the Defendant failed to pay a total of 924 hours of work by the Plaintiff, of which 760.43 were straight wage hours and 163.57 were overtime wage hours.

65.     As shown in this list of workweeks, between April 7, 2019 and March 3, 2022, the Defendant failed to pay a total of $31,154.16 in wages to the Plaintiff, of which $23,549.93 was for straight wage hours and $7,604.23 was for overtime wage hours.

66.     The total amount owed to Plaintiff, including late payment penalties, damages, PTO earned for hours that were unpaid, straight time wages, and overtime wages was approximately $69,171.

67.     For over two weeks, sporadic communications between Plaintiff and Defendant took place.

68.     Defendant consistently replied that Defendant was working in "good faith" but Plaintiff would not supply "underlying calculations".

69.     Near the end of March, 2022, Plaintiff filed a wage claim with the Minnesota Department of Labor ("MNDOL").

70.     Defendant informed Plaintiff that they did not believe the liquidated damages or late payment fees were acceptable.

71.     Plaintiff asked Defendant many times, and gave the Defendant many opportunities, to inform the Plaintiff which and how many hours of the Plaintiff's work at home that was unpaid, did the Defendant have a dispute over.

72.     Defendant did not dispute with Plaintiff any number of hours of work that Plaintiff demanded to be paid for.

73.     Plaintiff sent Defendant a demand for the statutory penalty under the MNFLSA and Minnesota Employment Statutes that Plaintiff had assessed on Defendant.

74.     Defendant informed Plaintiff that they did not believe the liquidated damages or late payment fees were acceptable.

75.     On or about April 2, 2022, Plaintiff received an agreement for his consideration that would pay Plaintiff for a portion of wages and damages that Plaintiff was already entitled to and additional sections not related to wages.

76.     The amount of consideration, $25,510, is the exact amount of wages that were unlawfully unpaid to Plaintiff for the time between January 12, 2020 and March 3, 2022.

77.     The Defendant based the amount of consideration in an agreement using the Plaintiffs records.

78.     The Defendant considered the records of unpaid hours that Plaintiff furnished to Defendant, accurate enough to base consideration on, yet did not pay Plaintiff for those hours.

79.     The Defendant unlawfully used Plaintiffs hard earned and unpaid wages to secure an agreement for a release of claims.

80.     Plaintiff rejected the agreement.

81.     The agreement offered an amount of consideration for far less than the wages, overtime wages, liquidated damages for the late payment of wages, and penalties for the late payment of wages that Plaintiff had not been paid.

82.     On or about April 3, 2022, President and CEO of Defendant, Randall Sampson, clarified that Defendant was asking for specific dates and specific times of Plaintiffs work at home when they said "underlying calculations".

83.     Defendant did not comply with FLSA, MNFLSA, and Minnesota Employment Statutes Recordkeeping requirements and was requiring the Plaintiff to provide their missing information.

84.     Plaintiff was informed by Mr. Sampson that any further communications with Defendant would need to go through their attorney, Mary O'Brien.

85.     On or about April 4, 2022, shortly after filing the wage claim with the MNDOL, the MNDOL informed the Plaintiff that Defendant falsely claimed Plaintiffs work was outside the scope of Plaintiffs employment and closed the claim without further information or investigation.

86.     The Defendants claim that the work Plaintiff had not been paid for was outside the scope of Plaintiff's employment, to the MNDOL, was fraudulent.

87.     The MNDOL informed Plaintiff that there was nothing more they could do and the Plaintiff should look into other ways to resolve the issue.

88.     The Defendant wanted a release of all claims, a return of Defendant's property, and other concessions, and used Plaintiffs unpaid wages to secure it.

89.     Plaintiff contacted Ms. O'Brien and once again demanded the wages that had not been paid.

90.     Ms. O'Brien immediately commenced negotiations for a release of all claims Plaintiff may have against Defendant.

91.     Plaintiff informed Ms. O'Brien that he wanted to be paid the wages that were due before a release of claims could be discussed. Ms. O'Brien understood.

92.     The next day, Ms. O'Brien sent Plaintiff another draft of an agreement. This new draft contained not only a portion of wages and damages that Plaintiff is entitled to as consideration, but many other sections including work property, work ownership, and confidentiality provisions.

93.     Plaintiff and Ms. O'Brien continued back and forth for three weeks, negotiating on items Defendant was insisting on including.

94.    On or about April 13, 2022, Plaintiff received a draft of an agreement which included consideration that would be paid "within three business days of the date this Agreement is approved by the Department of Labor".

95.    After complaints by Plaintiff of having to wait for payment of wages that Plaintiff was already entitled to, Ms. O'Brien did not include that provision in any future draft.

96.    Plaintiff communicated to Ms.O'Brien about his distress over the issues at hand and lack of sleep.

97.    Plaintiff questioned Ms. O'Brien during subsequent talks as to why the Department of Labor no longer needed to approve of an agreement and was told by Ms. O'Brien that we didn't need approval.

98.    On or about April 14, 2022, Plaintiff applied for work with the Minnesota Racing Commission for their open "Law Compliance Rep 1" employment position, which the Plaintiff was more than qualified for.

99.    On or about April 19, 2022, Defendant unlawfully retaliated against Plaintiff by excluding Plaintiff from Defendants property permanently.

100.    Defendants' exclusion of Plaintiff from Defendants property is continuous and reviewed daily.

101.    On or about April 24, 2022, Ms. O'Brien contacted Plaintiff and stated that Defendants were not going to continue going back and forth with the terms of an agreement and would defer to the Minnesota Department of Labor if Plaintiff did not agree.

102.    The MNDOL, who had already closed the claim without further investigation, was not going to be involved.

103.     Because Plaintiff could not afford legal counsel, Plaintiff believed that if the agreement was not signed quickly, that the Plaintiff would not receive any of the wages owed to him.

104.     Plaintiff was very concerned that Defendant was going to claim that Plaintiff was in breach of an agreement between the time it was signed and when Plaintiff would be paid some of the wages Plaintiff was owed.

105.     Plaintiff also had grave concern that Defendant was going to claim that Plaintiff had property that Plaintiff did not know he had and claim a breach of an agreement.

106.     Ms. O'Brien offered to split the agreement into 2 different agreements so Plaintiff would receive a payment the same day.

107.     On April 26, 2022 at 914am, Plaintiff received two agreements to sign.

108.     On April 26, 2022 at 936am, Plaintiff returned the first of two agreements, signed. (Exhibit 3)

109.     On April 26, 2022, Defendant paid to Plaintiff $12,750 for "alleged disputed wages earned before February 22, 2022" and $12,750 for "alleged non wage damages and penalties".

110.     On April 27, 2022, Defendant signed the second of two agreements which would pay Plaintiff, after a period of 20 days, $7,500 for "alleged nonwage damages". (Exhibit 2)

111.     Plaintiff is not an attorney.

112.     The Agreement between Plaintiff and Defendant signed on April 27, 2022 states that it is for claims made after Plaintiffs employment, without stating specific claims.

113.     The two agreements between the Plaintiff and Defendant included releases of FLSA claims.

114.     The two agreements between the Plaintiff and Defendant stated that the terms of the agreements were confidential and Plaintiff was restricted from discussing the terms to anyone other than his mother, state or federal departments or agencies that require notice of income changes, his attorney, and tax advisor.

115.     The two agreements between the Plaintiff and Defendant stated that Plaintiff was to understand that he was waiving any right to recover any damages or monetary amount from any Released Party, without exception.

116.      The two agreements between the Plaintiff and Defendant contained consideration to the Plaintiff of an amount less than what Plaintiff was already legally entitled to.

117.     The two agreements entered into between the Plaintiff and Defendant stated that Plaintiff had the right to consult with an attorney but did not advise the Plaintiff to do so.

118.     The two agreements between the Plaintiff and Defendant required that the Plaintiff must delete any and all information and must return documents and information of the Defendant, Defendant's affiliates, and any of the Released Parties.

119.     The agreement entered into between the Plaintiff and Defendant on April 27, 2022 has an integration clause stating that it is the entire agreement between the parties and supersedes any prior agreements or understandings.

120.     The two agreements between the Plaintiff and Defendant did not have approval by a court or the United States Department of Labor.

121.     The agreement entered into between the Plaintiff and Defendant on April  April 27, 2022 states that it is the entire agreement between the Defendant and Plaintiff, superseding any other agreement or understandings between the Defendant and Plaintiff and has consideration for non wage damages only.

13

122.     The agreement releases claims that the Plaintiff cannot legally release.

123.     Ms. O'Brien knows that a release of FLSA claims requires Court or Department of Labor approval.

124.     Plaintiff has never stated that he has been paid in full for wages.

125.     On or about April 28, 2022, Plaintiff was contacted by the Minnesota Racing Commision and was told they were "impressed by your background, and I would like to speak with you soon about this opportunity"

126.     On or about April 28,2022, Plaintiff was forced to withdraw his application for employment and interview with the Minnesota Racing Commission because the position would require being on the Defendant's property.

127.     On or about July 29, 2022, Defendants attorney responded to an email sent by the Plaintiff.

128.     Defendant's attorney informed Plaintiff that he had a choice as to whether to defer to the MNDOL or proceed with an agreement.

129.     The Plaintiff did not have that choice, the MNDOL had closed his claim, without investigation, after Defendant falsely stated Plaintiffs work was outside the scope of employment, and before contact was made with Defendant's attorney.

## <u>FIRST CLAIM FOR RELIEF</u>

### Failure to Pay Overtime Premium Wage in Violation of FLSA

130.     The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

131.     During the Statutory Period, Plaintiff was at all material times a non-exempt employee who was entitled to overtime payments during the Statutory Period.

132.    During the Statutory Period, Plaintiff worked in excess of 40 hours during multiple work weeks during the Statutory Period.

133.    During the Statutory Period, plaintiff did not receive overtime payment for all such overtime hours.

134.    Defendant and its agents knew or should have known that Defendant was required to pay overtime to Plaintiff during the Statutory Period.

135.    During the Statutory Period, Plaintiff was entitled to receive payment equal to one and one-half his hourly rate for every hour worked beyond forty (40) hours per week, along with attorneys' fees, costs, liquidated damages and all other relief appropriate under the FLSA.

136.    While employed by Defendants, Plaintiff provided labor and other services that qualified him for overtime under the FLSA.

137.    The FLSA requires payment of overtime for all work performed by an employee, regardless of whether it is carried out at an office or other work location or at the employee's home.

138.    Defendant willfully failed to maintain proper and accurate records as mandated by the FLSA yet expected Plaintiff to provide these records. Defendants willfully, intentionally, and with reckless disregard, failed to pay Plaintiff the overtime wage for all of his hours worked in violation of the FLSA.

139.    Defendant knowingly and intentionally failed to pay overtime to Plaintiff, in violation of the FLSA.

140.    Under the FLSA, employers who violate the provisions of the Act concerning overtime compensation are liable to the employee the unpaid wages and for an additional equal amount as liquidated damages. (29 U.S.C. § 216(b),§ 216(c)).

141.    Plaintiff is entitled to and seeks overtime wages that remain unlawfully unpaid by the Defendant, damages, and reasonable attorney's fees, and court costs under the FLSA.

## SECOND CLAIM FOR RELIEF

**Failure to Pay Wages in Violation of the MNFLSA and Minnesota Employment Statutes.**

142.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

143.    The FLSA, MNFLSA, and Minnesota Employment Statutes applied to Plaintiff's employment with Defendant at all times relevant herein.

144.    During the Statutory Period, Plaintiff was at all material times a non-exempt employee who was entitled hourly wages during the Statutory Period.

145.    During the Statutory Period, Plaintiff did not receive payment for all hours worked as well as the benefits of earned PTO that the Defendant should have credited to Plaintiff.

146.    Minnesota Employment Statutes mandate that wages are earned on the day an employee works and provides a substantive right for employees to the payment of wages.

147.    The MNFLSA and Minnesota Employment Statutes demand that when any employer employing labor within the State of Minnesota discharges an employee, the wages actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee. Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or at the rate required by law, including any applicable statute, regulation, rule, ordinance,

government resolution or policy, contract, or other legal authority, whichever rate of pay is greater.

148.     The MNFLSA and Minnesota Employment Statutes state that an employer who has violated the MNFLSA of Minnesota Employment Statutes in regards to the non-payment of wages to an employee, shall also be liable for liquidated damages in the amount of unpaid wages. From approximately 2015 to March 3, 2022, Defendants failed to pay Plaintiff, a non-exempt employee, wages for all hours worked in violation of the MNFLSA and Minnesota Employment Statutes entitling Plaintiff to his wages and an equal amount in liquidated damages.

149.     Defendant willfully failed to maintain proper and accurate records as mandated by the MNFLSA and Minnesota Employment Statutes. Defendants willfully, intentionally, and with reckless disregard, failed to pay Plaintiff the wages and added PTO benefits for all of his hours worked, in violation of the MNFLSA and Minnesota Employment Statutes.

150.     Plaintiff is entitled to and seeks wages that remain unlawfully unpaid by the Defendant, accrued PTO that the Plaintiff would have received if wages would have been paid correctly, damages, reasonable attorney's fees, and court costs under the MNFLSA and Minnesota Employment Statutes.

## <u>THIRD CLAIM FOR RELIEF</u>

**Failure to Pay Waiting Time Penalties in Violation of the MNFLSA and Minnesota Employment Statutes**

151.     The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

152.　　The MNFLSA and Minnesota Employment Statutes applied to Plaintiff's employment with Defendant at all times relevant herein.

153.　　Coverage under the FLSA, MNFLSA and Minnesota Employment Statutes includes both current and former employees.

154.　　The MNFLSA and Minnesota Employment Statutes mandates that an employer pay its employees all earned wages within 24 hours of a demand for unpaid wages.

155.　　The MNFLSA and Minnesota Employment Statutes authorizes an employee to recover waiting time penalties in an amount equal to the employee's average daily wages for up to fifteen (15) days following receipt of a demand for unpaid wages.

156.　　Defendant, to this day, willfully, intentionally, and with reckless disregard, failed to pay Plaintiff the wages for all of his hours worked in violation of the MNFLSA and Minnesota Employment Statutes.

157.　　Plaintiff is entitled to and seeks damages for the failure of the Defendant to timely pay all wages to the Plaintiff that were owed under the MNFLSA and Minnesota Employment Statutes

## **FOURTH CLAIM FOR RELIEF**

### **Unlawful Retaliation In Violation of FLSA - Claim A**

158.　　The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

159.　　The FLSA applied to Plaintiff's employment with Defendant at all times relevant herein.

160.　　Coverage under the FLSA, MNFLSA and Minnesota Employment Statutes includes both current and former employees.

161.    The FLSA prohibits retaliation against an employee because he "has filed any

complaint or instituted or caused to be instituted any proceeding under or related to" the

rights contained in the FLSA.

162.    On or about March 9, 2022, Vice President of Card Club Operations for the

Defendant, Michael Hochman, engaged Plaintiff stating that Mr. Hochman was

attempting to rehire Plaintiff.

163.    Communications continued with Mr. Hochman through about March 13, 2022.

164.    Plaintiff had no reason to believe that Mr. Hochman had decided not to rehire

Plaintiff.

165.    On or about March 16,2022, Defendant received a demand letter for unpaid

wages and unpaid overtime wages from Plaintiff.

166.    Discussions about Plaintiff's demand letter between Plaintiff and Defendant

continued through April 27, 2022.

167.    Plaintiff's demand letter constituted "a complaint" and was protected activity

under the FLSA.

168.    As a direct and proximate result of receiving Plaintiff's demand letter for owed

wages, Defendant ceased all communications with Plaintiff in regards to rehiring

Plaintiff.

169.    On or about April 19, 2022, as a direct and proximate result of receiving Plaintiff's

demand letter for unpaid wages, Defendant permanently excluded the Plaintiff from

Defendants property.

170.    Defendants unlawful exclusion of Plaintiff from their property is "continuous and

reviewed daily". Each and every day, Defendants unlawful, retaliatory exclusion is

reviewed by the Defendant and each and every day, Defendant viciously retaliates against the Plaintiff.

171.    Defendant's unlawful exclusion from Defendants property and failure to rehire constituted a retaliatory action, undertaken by Defendant in direct response to Plaintiff's assertion of rights protected by the FLSA.

172.    As a direct, foreseeable, and proximate result of Defendants' actions, Plaintiff has suffered, and continues to suffer, a loss of earnings and job benefits; he has suffered and continues to suffer emotional distress; and he has incurred and continues to incur expenses.

173.    Defendant committed the acts herein alleged maliciously and oppressively with the wrongful intent to injure Plaintiff. Defendant acted with an improper and evil motive amounting to malice and a conscious disregard for Plaintiff's rights. The acts taken towards the Plaintiff were carried out by Defendant acting in deliberate, callous and intentional manner with a desire to injure and damage.

174.    Plaintiff is entitled to and seeks legal and equitable relief including compensatory, emotional distress, punitive and liquidated damages, and reasonable attorney's fees and costs for the Defendants unlawful retaliation under the FLSA.

## FIFTH CLAIM FOR RELIEF

### Unlawful Retaliation In Violation of FLSA - Claim B

175.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

176.    The FLSA applied to Plaintiff's employment with Defendant at all times relevant herein.

177.     Coverage under the FLSA, MNFLSA and Minnesota Employment Statutes includes both current and former employees.

178.     The FLSA prohibits retaliation against an employee because he "has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the rights contained in the FLSA.

179.     On or about March 16,2022, Plaintiff sent Defendant a demand letter for unpaid wages.

180.     Plaintiff's demand letter constituted "a complaint" and was protected activity under the FLSA.

181.     Discussions about Plaintiff's demand letter between Plaintiff and Defendant continued through April 27, 2022.

182.     On or about April 14, 2022, Plaintiff applied for work with the Minnesota Racing Commission for their open "Law Compliance Rep 1" employment position, which the Plaintiff was more than qualified for.

183.     On April 19, 2022, as a direct and proximate result of receiving Plaintiff's demand letter for unpaid wages and ongoing discussions regarding the demand letter, Defendant permanently excluded Plaintiff from Defendants property.

184.     On or about April 28, 2022, Plaintiff was contacted by the Minnesota Racing Commision and was told they were "impressed by your background, and I would like to speak with you soon about this opportunity"

185.     On or about April 28,2022, Plaintiff was forced to withdraw his application for employment and interview with the Minnesota Racing Commission because the position would require being on the Defendant's property.

186.     Defendant's unlawful exclusion from Defendants property constituted a retaliatory action, which directly affected Plaintiffs by preventing him from obtaining a job that he was more than qualified for and was undertaken by Defendant in direct response to Plaintiff's assertion of rights protected by the FLSA.

187.     Defendants unlawful exclusion of Plaintiff from their property is "continuous and reviewed daily". Each and every day, Defendant unlawful, retaliatory exclusion is reviewed by the Defendant and each and every day, Defendant viciously retaliates against the Plaintiff.

188.     As a direct, foreseeable, and proximate result of Defendants' actions, Plaintiff has suffered, and continues to suffer, a loss of earnings and job benefits; he has suffered and continues to suffer emotional distress; and he has incurred and continues to incur expenses.

189.     Defendant committed the acts herein alleged maliciously and oppressively with the wrongful intent to injure Plaintiff. Defendant acted with an improper and evil motive amounting to malice and a conscious disregard for Plaintiff's rights. The acts taken towards the Plaintiff were carried out by Defendant acting in deliberate, callous and intentional manner with a desire to injure and damage.

190.     Plaintiff is entitled to and seeks legal and equitable relief including compensatory, emotional distress, punitive, liquidated damages, and reasonable attorney's fees and costs for the Defendants unlawful retaliation under the FLSA.

## DECLARATORY RELIEF

### Agreements Between Defendant and Plaintiff

191.     The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

192.     Defendant and Plaintiff entered into an agreement on April 26, 2022 (exhibit 3) and again on April 27, 2022 (exhibit 2).

193.     The FLSA is intended to protect workers from employers with superior bargaining power, who may extract unreasonable, discounted settlements for broad releases of claims, and even more so for those that are unrepresented by counsel.

194.     Both agreements include releases by the Plaintiff for FLSA claims that cannot be released under the FLSA without court or United States Department of Labor approval.

195.     Plaintiff was placed under extreme undue duress by Ms. O'Brien immediately prior to signing the agreements by stating to Plaintiff that the Defendant was not going to continue negotiating and would work with the MNDOL to resolve the issues if Plaintiff did not accept an agreement. Plaintiff had already been told by the MNDOL the case had been closed because Defendant falsely stated to the MNDOL, in an attempt to force Plaintiff into an agreement for a broad release of claims, that Plaintiffs work was outside the scope of his employment. Plaintiff was placed in a position to be forced to enter into an agreement or get nothing.

196.     Ms. O'Brien had placed a specific stipulation in a draft agreement sent to Plaintiff that payment for any wages would be delayed after signing by the Plaintiff until the agreement was approved by the United States Department of Labor. Later, after removing this stipulation because Plaintiff demanded wages to be paid without a delay, Ms. O'Brien stated in a conversation to Plaintiff that the approval was now not needed. Ms. O'Brien intentionally misled Plaintiff because Ms. O'Brien was aware that the United States Department of Labor would most likely not approve.

197.     The agreement entered into between Plaintiff and Defendant on April 27, 2022 contained an integration clause, of which Plaintiff believes rendered the agreement

entered into on April 26, 2022 as null and void at the time Plaintiff signed the second agreement, thus creating confusion for Plaintiff.

198.     The agreement entered into on April 27, 2022 does meet requirements of the Older Workers Benefit Protection Act as it includes consideration for less than what the Plaintiff was already legally entitled to and it does not advise Plaintiff to seek a lawyer, by failing these requirements, the agreement was not knowingly and willingly signed.

199.     Both agreements infringe on Plaintiffs protected rights to file a charge with the Equal Employment Opportunity Commission for discrimination by requiring Plaintiff to return or delete any "information" of the Defendant.

200.     Both agreements restrict the ability of Plaintiff to collect, as he is entitled to, any possible whistleblower award under the Dodd-Frank Act.

201.     Both agreements violate public policy and/or public interests by silencing Plaintiff and preventing others from enforcing their rights.

202.     Both agreements contain inadequate consideration as Plaintiff is legally entitled to his wages, damages, and penalties under the FLSA and MNFLSA. Plaintiff never agreed that his hours worked and corresponding wages had been paid in full, nor was there a bona fide dispute or negotiation over the number of hours worked. The Defendant unlawfully withheld Plaintiffs wages to secure a broad release of claims.

203.     Negotiations and discussions between the Plaintiff and Defendant pertaining to the agreement were primarily focused on the demands of the Defendant and any discussion over consideration by the Defendant was quickly squashed.

204.     As a self represented individual, Plaintiff would have every right to expect Defendant's attorney to not create an agreement that would violate his legally protected rights, one that is understandable, and free from errors.

205.     Plaintiff is entitled to a declaration that the agreements entered into on April 26,

2022 and April 27, 2022 between the Defendant and Plaintiff are in part or in whole,

void, voidable, invalid, and/or unenforceable and/or the tendering back by Plaintiff of

consideration, which was less than amount Defendant has unlawfully unpaid to Plaintiff,

is not required.

## Willful Violations Under the FLSA, MNFLSA, and Minnesota Employment Statutes.

206.     The allegations of each of the preceding paragraphs are realleged and

incorporated herein by reference.

207.     The Defendant willfully violated the FLSA, MNFLSA, and Minnesota Employment

Statutes by willfully denying Plaintiff the wages earned while employed, failing to keep

accurate records of the Plaintiffs work hours, suffering and/or permitting Plaintiff to work

at home and without proper payment of wages for his time working, and having actual

and constructive knowledge that the Plaintiff was working at home unpaid.

208.     Defendant maliciously withheld wages from the Plaintiff, even after being

presented with full and convincing records.

209.     Defendant did not dispute with the Plaintiff the number of hours unpaid, yet still

continued to withhold wages from the Plaintiff with malicious and evil intentions until he

gave in to Defendants demands.

210.     Under the FLSA, MNFLSA, and Minnesota Employment Statutes, Plaintiff is

entitled to a three year statute of limitation for the willful violations of the Defendant.

211.     Plaintiff is entitled to a declaration that the Defendant was willful in the

nonpayment of wages to the Plaintiff under the FLSA, MNFLSA, and/or Minnesota

Employment Statutes, extending the statute of limitation of FLSA claims from two to three years.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment against Defendant as follows:

1. For a declaration that the agreements entered into on April 26, 2022 and April 27, 2022 between the Defendant and Plaintiff are in part or in whole, void, voidable, invalid, and/or unenforceable and/or the tendering back by Plaintiff of consideration, which was less than amount Defendant has unlawfully unpaid to Plaintiff, is not required.

2. For a declaration that the Defendant was willful in the nonpayment of wages to the Plaintiff under the FLSA, MNFLSA, and/or Minnesota Employment Statutes, extending the statute of limitation of FLSA claims from two to three years.

3. Unpaid wages at hourly rate, overtime premium wages, accrued PTO that was denied to Plaintiff, and other compensation denied or lost to Plaintiff to date by reason of Defendants' unlawful acts.

4. Liquidated damages in an amount equal to wages unlawfully unpaid under the MNFLSA and Minnesota Employment Statutes.

5. Liquidated damages in an amount equal to overtime wages unlawfully unpaid under the FLSA.

6. Penalties for the late payment of unlawfully unpaid wages under the MNFLSA and Minnesota Employment Statutes.

7. Compensatory, emotional distress, punitive, and liquidated damages for Defendants unlawful retaliation under the FLSA by not rehiring Plaintiff.

8. Compensatory, emotional distress, punitive, and liquidated damages for Defendants unlawful retaliation under the FLSA by preventing Plaintiff from obtaining suitable employment for which Plaintiff was qualified for.

9. General, compensatory, and special damages.

10.     Exemplary and punitive damages.

11.     Reasonable attorney's fees and costs of suit pursuant to 29 U.S.C. § 216 (b) and other laws.

12.     Such other and further relief as this Court deems just and proper.

Respectfully submitted,

Danny Huff

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial as provided by the Federal Rules of Civil Procedure.

Respectfully submitted,

Danny Huff